No.  95-396

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

CAROL ANN CARRILLO,

     Petitioner and Appellant,

  v.

LIBERTY NORTHWEST INSURANCE,

     Respondent and Insurer for

BLUE CROSS BLUE SHIELD,

     Respondent and Employer.

FILED

SEP 03 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    Workers' Compensation Court of the State of Montana
              The Honorable Mike McCarter, Judge presiding.


COUNSEL OF RECORD:

     For Appellant:

         James G. Hunt, Dix and Hunt,
         Helena, Montana

     For Respondent:

         Larry Jones, Senior Attorney, Liberty
         Northwest Insurance, Missoula, Montana


Submitted on Briefs:  April 18, 1996

Decided:  September 3, 1996

Filed:

Ed Smith

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The petitioner, Carol Ann Carrillo, filed a petition in the Workers' Compensation Court of the State of Montana in which she sought benefits for an injury which she alleged occurred in the course and scope of her employment with Blue Cross Blue Shield in 1993. After a trial, the Workers' Compensation Court entered an order and judgment in which it concluded that Carrillo's injury did not occur during the course and scope of her employment and denied her claim. Carrillo appeals the order and judgment. We reverse the judgment of the Workers' Compensation Court.

The issue on appeal is whether the Workers' Compensation Court erred when it concluded that Carrillo's injury did not arise out of and in the course and scope of employment.

## FACTUAL BACKGROUND

Carol Ann Carrillo suffered an injury on the afternoon of March 2, 1993, when she was struck by an automobile while crossing an intersection in Helena. At the time of her injury, Carrillo had left the building where she worked and was walking toward the Holter Museum, which is one and one-half blocks from her place of employment. She had planned to purchase a gift for a co-worker who was leaving and for whom Carrillo and other co-workers were planning a party. Carrillo worked for Blue Cross Blue Shield (BCBS) of Montana which was insured against workers' compensation claims by Liberty Northwest Insurance (Liberty). After her injury, Carrillo filed a timely claim for workers' compensation which

2

Liberty denied on the basis that her accident did not arise out of and in the course of her employment.

After Liberty denied her claim, Carrillo filed a claim with the Workers' Compensation Court in which she alleged that she was injured when hit by a car during her fifteen-minute break from work. Liberty responded and contended that she had abandoned her employment and was not on break. The Workers' Compensation Court held a trial on March 23, 1995, to determine whether Carrillo's injury occurred within the course and scope of her employment.

Testimony from the trial and from depositions reveals that at the time of the accident, Carrillo worked at BCBS offices located in the Donovan building which is on the west side of Last Chance Gulch south of its intersection with Lawrence Street in Helena. BCBS provided its employees with a fifteen-minute break in the morning and another fifteen-minute break in the afternoon. Employees customarily took the afternoon break sometime between 2:00 and 3:30 p.m. A substantial number of BCBS employees walk during their breaks and Carrillo testified that she walked during ninety percent of her breaks. While BCBS encouraged its employees to engage in a healthy lifestyle, it did not require them to walk during breaks or even to take breaks; employees were free to take them or leave them.

A small break room was located in the basement of the Donovan building where Carrillo worked. Approximately fifty to seventy-five employees worked in the Donovan building and employees at the

Donovan building often walked to the Fuller building for breaks. The Fuller building is a second BCBS office which is located on the northwest corner of Fuller and Lawrence streets, approximately one block away from the Donovan building. Employees also walked to other nearby businesses to take their breaks and BCBS also had a room in the Downtown Athletic Club for use as a break room.

Testimony also revealed that BCBS permits its employees to give going-away parties for employees leaving BCBS or transferring to other departments. The parties were, at times, held during breaks and planning could be done anytime during the day. On their breaks, employees would sometimes buy going-away gifts from nearby merchants.

At the time of the accident, Carrillo's direct supervisor, Beth Lamping, was leaving Carrillo's unit and transferring to another job at BCBS. Therefore, Carrillo and her co-employees planned a going-away party for Lamping and decided to buy her a coffee mug to replace the one she had broken.

At approximately 2:15 p.m. on March 2, 1993, Carrillo left the Donovan building to go to the Holter Museum gift shop, which is approximately one and one-half blocks away from the Donovan building, to buy Lamping a replacement mug. Carrillo was not required by BCBS or her supervisor to purchase a mug for Lamping. She intended to return to the Donovan building to pick up a co-worker, then proceed to the Fuller building during her break. However, while on her way to the Holter Museum, a car struck her

4

while she was crossing Lawrence Street and she sustained the injuries for which she now seeks compensation.

Ultimately, the BCBS employees held the party for Lamping during work hours and Carrillo's co-workers drove to Carrillo's house to take her to the party.

After a trial, the Workers' Compensation Court concluded that Carrillo was not entitled to workers' compensation benefits because she did not suffer an injury arising out of and in the course of her employment.

DISCUSSION

Did the Workers' Compensation Court err when it concluded that Carrillo's injury did not arise out of and in the scope of her employment?

We review the Workers' Compensation Court's conclusions of law to determine whether they are correct. *CNA Ins. Cos. v. Dunn (1995)*, 273 Mont. 295, *298, 902* P.2d 1014, 1016; *Stordalen v. Ricci's Food Farm* (1993), 261 Mont. 256, 258, 862 P.2d 393, 394. We review the Workers' Compensation Court's findings of fact to determine whether substantial evidence supports the findings. *Wunderlich v. Lumbermens Mut. Casualty Co.* (1995), 270 Mont. 404, 408, 892 P.2d 563, 566 (citing *Smith v. United Parcel Serv.* (1992), 254 Mont. 71, 75, 835 P.2d 717, 720).

Section 39-71-407(1), MCA, provides in part that " [e]ach insurer is liable for the payment of compensation . . to an employee of an employer that it insures who receives an injury

5

<u>arising</u> <u>out of and in the course of employment</u>."    (Emphasis    added.)

We have stated that:

> No exact formula can be laid down which will automatically solve every case involving the question of whether an accident arises out of and in the course of employment, but each case must depend upon its particular facts and circumstances.

*Partoll v. Anaconda Copper Mining Co.* (1949), 122 Mont. 305, 310-11, 203 P.2d 974, 977.

In this case, the Workers' Compensation Court relied on § 39-71-407 (3), MCA, to reach its conclusion that Carrillo did not sustain her injury during the course and scope of employment. Section 39-71-407(3), MCA, pertains to traveling employees and provides that "[a]n employee who suffers an injury . . . while traveling is not covered by this chapter unless" certain conditions are met. Subsections (a) and (b) of 39-71-407(3), MCA, delineate when such injuries would be compensable and provide:

> (a)(i) the employer furnishes the transportation or the employee receives reimbursement . . . and
> (ii) the travel is necessitated by and on behalf of the employer as an integral part or condition of the employment; or
> (b) the travel is required by the employer as part of the employee's job duties.

The Court first concluded that Carrillo was traveling when injured by stating:

> The word "traveling" is not specifically defined in the Workers' Compensation Act but in its ordinary and usual sense it means going from one place to another. Larson's treatise on workers' compensation similarly refers to "traveling employees" as "employees whose work entails travel <u>away from the employer's premises</u>." 1A Larson Workmen's Compensation Sec. *25.00* at 5-275

6

(underlining added).  Claimant was going from her place
of employment to a different place.

The Court then analyzed § 39-71-407(3), MCA, and relevant cases to conclude that the injuries Carrillo suffered while traveling were not compensable.

Carrillo contends that the court incorrectly concluded that the traveling statute, § 39-71-407(3), MCA, controlled the case. Instead, she contends that she was not traveling, but was on a "break" when injured and therefore that she was within the course and scope of her employment.  In support of her contention that she was on break, she refers to her uncontroverted testimony at trial. Her attorney asked:  "If you were to say, 'yes, I was on break,' or 'No, I was not on break,' when you left the Donovan Building to go to the Holter Museum, would you say yes or no?" and she replied, "Yes."

The Workers' Compensation Court made no specific finding that Carrillo was or was not on break at the time of her injury.  The only finding that refers to her afternoon break was Finding No. 10 in which the court stated that Carrillo

> left the Donovan building to go to the Holter Museum gift shop, which is approximately a block and a half away from the Donovan building, to buy Lamping a replacement mug. She intended to return to the Donovan building to pick up a co-worker, then proceed to the Fuller building for a break.

Liberty contends that when the court found that Carrillo was going on break after getting the gift, the court in fact found that she was not on break while getting the gift and that substantial

7

evidence supports that finding. However, there is nothing inconsistent with her being on break at the time of her injury and her intention to continue her break at another location later on. In fact, the uncontroverted evidence and the Workers' Compensation Court's findings compel just that conclusion.

In her testimony, Carrillo described the break policy as follows:

> The breaks were normally--sometimes you didn't take a break, sometimes you took a 15- or a 20-minute break, sometimes you just needed to get away and some people would be gone longer than that. It was kind of an unwritten code.

When asked if she was free to take a break when she wanted during the break period, which she said occurred between "2:00 to 3:30 or something," Carrillo replied yes and also testified that she was free to leave the building and to go anywhere she wanted.

Here, Carrillo left the Donovan building at approximately 2:15 p.m. which is within the period of time that afternoon breaks are normally taken by BCBS employees. She planned to walk to a gift shop one and one-half blocks away and testified that she knew exactly what she needed to find. While true that Carrillo testified, as the Workers' Compensation Court found, that she was going to return to the Donovan building to pick up a co-worker, then proceed to the Fuller building "on break," she also testified that it would take her, "two to three minutes to get to the Holter Museum; two to three minutes to look for the mug; two to three minutes to get back to the Donovan Building, and another two to

8

three minutes to pick up Sandy and get over to the Fuller Building; two to three minutes to pick up whatever we were going to buy there at the Fuller Building, and another two to three minutes to get back." Therefore, she testified that her planned activities would have taken between twelve and eighteen minutes to complete. And, had Carrillo not been injured, she would have completed her activities within the time allocated for BCBS employee breaks-- fifteen to twenty minutes.

Therefore, based on the undisputed evidence and the Workers' Compensation Court's finding that this was a typical way in which BCBS employees spent their break time, we conclude that Carrillo was on break when she was walking to the Holter museum and was hit by a car and injured.

Having concluded that Carrillo was on break when injured, we must determine if and when an employee injured during an authorized break is within the course and scope of employment. We have not previously decided this issue. In fact, only two Montana cases involve somewhat similar circumstances- -*Strickland v. State Compensation Mutual Ins. Fund* (1995), 273 Mont. 254, 901 P.2d 1391, and *Geary v. Anaconda Copper Co.* (1947), 120 Mont. 485, 188 P.2d 185.

In *Geary,* the worker suffered an eye injury during a lunch hour game of handball on the employer's premises. The employer required the employees to remain on the premises in an "on call" status during the lunch period. Some of the employees had been playing handball during the lunch hour for approximately three months prior

9

to the accident. On some occasions, the claimant's foreman had participated in the game and in fact was present on the day of the accident. *Geary*, 120 Mont. at 486, 188 P.2d at 483. In that case, we looked at case law from other jurisdictions, indicated the importance of the employer's knowledge of the activity and the employer's requirement that the employees remain on call, noted that the Workers' Compensation Act was to be construed liberally, and found the injuries compensable. *Geary*, 120 Mont. at 490, 188 P.2d at 187.

While we awarded compensation in Geary, it differs from this case in several respects. When we decided Geary, a different version of the Act applied and we were required to liberally construe the Act. Most importantly however, according to <u>Larson's Workmen's Compensation Law,</u> *Geary* differs because the injury occurred during a lunch break rather than during a "coffee break."

In his treatise, Larson differentiates between injuries which occur during unpaid lunch breaks and those which occur during shorter, paid coffee breaks. *See* 1 <u>Larson's Workmen's Compensation Law</u>, § **15.51** at 4-157, and § 15.54 (1996). Specifically, unpaid lunch breaks are treated like trips at the beginning or end of a workday and involve the "going to and from" rule with its exceptions, whereas shorter paid breaks do not involve the "going to and from" rule with its exceptions. See generally 1 <u>Larson</u>, § 15.51; § 15.54.

10

The Montana Department of Labor and Industry also recognizes the distinction between coffee breaks and longer meal periods:

> Bona fide meal periods. Bona fide meal periods are not work time. Bona fide meals do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special circumstances. The employee is not relieved if he is required to perform any duties, whether active or inactive while eating. For example, an office employee who is required to be at his machine is working while eating.

Rule 24.16.1006(2)(a), ARM.

Larson concludes that this difference between coffee breaks and lunch breaks is justified "because normally the duration of the lunch period, when lunch is taken off the premises, is so substantial and the employee's freedom of movement so complete that the obligations and controls of employment can justifiably be said to be in suspension during this interval." 1 <u>Larson</u>, § *15.54* at *4-183*.

We have previously determined that § 39-71-407(3), MCA, the statute relied on by the Workers' Compensation Court to decide this case, codified Montana's going to and from rule:

> In 1987, the legislature amended § 39-71-407, MCA, to codify exceptions to the general workers' compensation rule that actions occurring when employees are going to or coming from work are not within the course and scope of their employment.

*Dale v. Trade Street, Inc.*(1993), 258 Mont. 349, 352, 854 P.2d 828, 829. Therefore, according to Larson's analysis of the difference between lunch breaks and coffee breaks, while § 39-71-407(3), MCA--the

11

codification of Montana's going to and from rule--applies to injuries sustained during lunch hours, it does not concern injuries which a worker suffers while on coffee break. Because we have previously determined that Carrillo was on break when injured, the Workers' Compensation Court erred when it decided this case based solely on Carrillo's failure to meet the requirements of § 39-71-407(3), MCA. Reliance on this statute was also erroneous because it first required the Workers' Compensation Court to conclude that Carrillo was "traveling" at the time of her injury. In order to arrive at that conclusion, the court relied on its common understanding of the term and a misapplication of Larson's reference to "traveling employees" at 1A Larson's Workmen's Compensation Law, § 25.00 at 5-275. However, according to Black's Law Dictionary 1500 (6th ed. 1990), to travel is "[t]o go from one place to another at a distance; to journey." It does not seem to include trips of one and one-half blocks.

Recently, in *Strickland,* we considered whether a person injured after having left work during her work shift was injured during the course and scope of her employment. *Strickland,* 273 Mont. at 257-59, 901 P.2d at 1393-94. We held that a person injured while on a personal errand was not acting within the course and scope of her employment when injured. *Strickland,* 273 Mont. at 259, 901 P.2d at 1394. In that case, we agreed with both the Workers' Compensation Court's finding that claimant left work on a personal errand and

12

with its conclusion that claimant was outside the course and scope of her employment

In *Strickland we* used § 39-71-407(3), MCA, as did the Workers' Compensation Court, to conclude that claimant's injuries were outside the scope of employment; however, in *Strickland*, we did not determine whether an injury suffered while on a break was compensable. Strickland neither contested the applicability of § 39-71-407(3), MCA, nor did she contend that she was injured while on break. Instead, Strickland asked us to conclude that she was within the course and scope of her employment despite the determination that she was on a personal errand. *Strickland*, 273 Mont. at 258, 901 P.2d at 1393.

Because neither *Strickland* nor *Geary* apply, we have not specifically dealt with the question presented here. However, case law from other jurisdictions and <u>Larson's</u> discuss the issue. Larson states:

> [N]ow that the coffee break or rest break has become a fixture of many kinds of employment, close questions continue to arise on the compensability of injuries occurring off the premises during rest periods or coffee breaks of various durations and subject to various conditions. It is clear that one cannot announce an all-purpose "coffee break rule," since there are too many variables that could affect the result . . . [such as] <u>the duration . . whether the interval is a risht fixed by the employment contract, whether it is a paid interval, whether there are restrictions on where the employee can go during the break, and whether the employee's activity during this period constituted a substantial personal deviation.</u>

> The operative principle which should be used to draw the line here is this: If the employer, in all the

13

> circumstances, including duration, shortness of the off-premises distance, and limitations on off-premises activity during the interval can be deemed to have retained authority over the employee, the off-premises injury may be found to be within the course and scope of employment.

1 Larson, § 15.54, at 4-183 through -85 (footnotes omitted) (emphasis added).

Consistent with Larson, several states allow compensation for injuries sustained during coffee breaks. For example, in *Jordan v. Western Electric Co.* (Or. App. 1969), 463 P.2d 598, 599, claimant suffered an injury off the premises while returning from a coffee break. While break facilities were available on the premises, employees customarily went to the nearest restaurant, approximately two and one-half blocks away. *Jordan, 463 P.2d* at 599. An award of compensation was affirmed because the coffee break was for the employer's benefit as well as the employee's, it was contemplated under the contract of employment, it was acquiesced in by the employer, there was an element of control because the supervisor accompanied the employees, and the claimant was paid for the coffee break. *Jordan,* 463 P.2d at 601-02.

In *Mellis v. McEwen (Or.* 1985), 703 P.2d 255, an employee suffered an injury in a public cafeteria during a fifteen-minute break. The Oregon court applied the *Jordan* factors, found claimant's injury was within the course and scope of employment, and stated: "[W]e find that a 15 minute break is a 'typical kind of coffee break activity that is contemplated by an employer' and that claimant's activity

14

was not a departure from the employment relationship." *Mellis*, 703 P.2d at 257.

In *Roache v. Industrial Commission of the State* of *Colorado* (Colo. App. 1986), 729 P.2d 991, the claimant left her work place and was injured in an explosion in a convenience store where she had gone during a fifteen-minute paid break. The court adopted the <u>Larson</u> analysis and awarded compensation:

> Determination of these issues rests upon inquiry into such matters as: whether the break period is of a duration so short as to support the inference that employment activities were virtually uninterrupted; whether it is provided for by employment contract; whether it is a paid interval; whether the employer permits off-premises breaks; whether the off-premises location is in close proximity to the employment site; and whether there are limitations on where the employee may go during break.
>
> . . . The break period was of short duration and it was a paid interval. The store was located not far from the claimant's place of employment, and the visit was for the basic purpose of rest and confinement.

*Roache*, 729 P.2d at 992 (citations omitted).

In a California case, an employee suffered an injury when, during a paid coffee break, she and several other employees went swimming in a canal a short distance from the employer's property. *State Comp. Ins. Fund v. Workmen's Comp. Appeals Bd.* (Cal. 1967), 434 P.2d 619, *620*. The court found that the employer at least tolerated similar acts and awarded compensation. *State Comp. Ins. Fund, 434* P.2d at 621.

Therefore, other courts have found injuries which occurred during coffee breaks compensable and in doing so have looked to the

considerations set forth in Larson. One of those factors is whether the employee was paid during the break. An uncompensated employee should be free to do whatever he or she wishes, whereas a paid employee is not. *See King Waterproofing Co. v. Slovksy* (Md. 1987), 524 A.2d 1245, 1249 (distinguishing between short paid breaks and longer unpaid lunch breaks). Carrillo testified that BCBS paid her during her breaks, and therefore, Carrillo satisfies this factor.

As to Larson's criteria that the right to a break be fixed in the employment contract, Carrillo testified that BCBS employees were entitled to two breaks, one in the morning and one in the afternoon. Not only did Carrillo testify to her right to breaks, but also, the Montana Department of Labor and Industry Regulations defines rest period as hours "worked":

> Rest. Rest periods of short duration, running from 5 minutes to about 20 minutes, are common in industry. They promote efficiency of the employee and are customarily paid as working time. They must be counted as hours of work. Compensable time of rest periods may not be offset against other working **time** such as compensable waiting **time** or on-call time.

Rule 24.16.1006(1), ARM (emphasis added). The Department of Labor also recognizes that employers provide breaks to their employees, that these breaks serve the employer's interests, and that they are not a departure from work **time.**

A third factor is "whether there are restrictions on where the employee can go during the break." Liberty asserts that evidence does not show that Carrillo's employer exercised any control over

her activity during that break, but instead shows that it simply set general boundaries within which the break could be taken and set limitations on the duration of the break. However, while some of the testimony supports Liberty's assertion, testimony also reveals that Carrillo had in the past been asked by her supervisor not to leave the building because she might be needed and had also been asked to postpone her break. Furthermore, Carrillo testified that, on occasion, someone had been dispatched to find her while on break and to bring her back. Therefore, although BCBS only set boundaries within which the break could be taken and set limitations on the duration of the breaks, these limitations amounted to the requisite "restrictions on where the employee can go during the break" and therefore, Carrillo also satisfies this element.

Finally, we look at whether the employee's activity during this period constituted a substantial personal deviation. In this case, Carrillo's injury occurred while she walked to a gift shop one and one-half blocks away from her work place. Carrillo knew exactly what she needed and testified that her planned activities would have taken between twelve and eighteen minutes to complete. Carrillo also testified that her employer not only acquiesced in the employees' departure from the premises during break, but gave them little choice because of the inadequate break facilities at the Donovan building where she worked. Finally, she also testified

17

that she walked during ninety percent of her breaks and that her director walked with her on occasion.

Carrillo also testified about the parties that employees at BCBS held for others who were transferring or leaving. Testimony revealed that employees expected these parties, that both the planning and the parties occurred during work hours, and that supervisors knew about and participated in these parties. In this case, the employees planned a party for a supervisor who was leaving and planned to give her a particular mug; Carrillo went to purchase the mug at the Holter gift shop when she was injured. Because Carrillo usually walked on breaks, because she would have been on a break of normal duration if not injured, and because she went to the gift shop to look for a gift for use at one of the BCBS parties, her activity during the break period did not constitute a substantial personal deviation.

Therefore, Carrillo meets the factors Larson sets forth for determining whether one's injury during a coffee break is within the course and scope of employment. Carrillo had a right to a break for which she was paid; BCBS placed restrictions on where the employees could go during the break; and Carrillo's activity did not constitute a substantial personal deviation from her employment.

For these reasons, we conclude that Carrillo was acting within the course and scope of her employment when injured and the Workers' Compensation Court erred when it concluded otherwise. We

18

therefore reverse the order and judgment of the Workers' Compensation Court.

_____
                    Justice

We concur:

_____
          Chief Justice

_____

_____

_____
                    Justices

Justice William E. Hunt, Sr., did not participate in this decision.

19

Justice Charles E. Erdmann dissenting.

I respectfully dissent from the Court's opinion.

I do not agree with the majority that the Workers' Compensation Court made no finding that Carrillo was or was not on her break at the time of her injury. In Finding of Fact No. 10, the Workers' Compensation Court found that Carrillo left the Donovan building to go to the Holter Museum gift shop, after which she intended to return to the Donovan building to pick up a co-worker and then go on break. This finding accurately reflects Carrillo's testimony that after she purchased the mug she planned to return to the Donovan building to go on break with her co-worker.

Carrillo's deposition states as follows:

Q. Why don't you tell me just in your own words, take as long or short as you like, what happened on March 2nd, 1993 when you got hurt. Why don't you start with what you were doing just before you went on break.

A. Well, we had just finished or we had started to discuss and were contemplating what we were going to do for Beth, my supervisor, for her party and we were trying to decide who we were going to have come, what we were going to have, what kind of present, if we were still going to continue, to look for the present that I hadn't been able to find. I had spoken with - I don't remember if it was Kelly or somebody there - they all knew that I had anticipated going up to the Holter Museum to look for the present for Beth. I had talked to Sandy before I left the building and asked her if she wanted to come along and she said "No."

Q. Excuse me, Sandy Warren?

A. Yes. And she said, "No." She says, "When you get through with the Holter Museum, why don't you come back, pick me up, and we'll go over to the Fuller Building on break," and I said "Okay," and I left the building.

20

Q. You left the building and started to cross the intersection and you were hit by a vehicle?

A. Right.

Carrillo testified to the same effect at trial:

Q. This morning you testified about Sandy Warren calling and asking you to go on break, and I believe you told her that you wanted to go to the Holter Museum first; is that right?

A. Yes.

Q. You agree, don't you, that it was your intent after you went to the Holter Museum that you were going to go back and get Sandy and then you were going to go on break on the day you were hit by that vehicle?

A. Would you rephrase that, please?

Q. Yes.

[Court reporter read back the previous question]

A. Yes.

Later in her testimony, Carrillo's attorney attempted to rehabilitate her deposition and her earlier testimony with the following question and answer:

Q. Because it's critical to this situation, if you were to say, "Yes, I was on break," or "No, I was not on break," when you left the Donovan Building to go to the Holter Museum, would you say yes or no?

A. Yes.

The majority refers to this latter question and answer as Carrillo's "uncontroverted testimony at trial" and relies on it exclusively. The record is clear, however, that Carrillo herself controverted that testimony.

This Court's function on review is confined to determining whether there is substantial evidence to support the findings and

21

not to determine whether there is sufficient evidence to support contrary findings. Davis v. Jones (1985), 216 Mont. 300, 303, 701 P.2d 351, 353. Here, the Workers' Compensation Court observed Carrillo's demeanor, assessed her conflicting testimony and made a finding accepting that portion of her testimony that she intended to go on break after shopping. There is substantial evidence in the record--through Carrillo's own testimony--that she was on a personal errand when she was injured and that she intended to start her break when she returned to the Donovan building. The majority ignores Carrillo's testimony and the standard this Court must apply when conflicting evidence exists. Where there is conflicting evidence, it is the Workers' Compensation Court's duty, and not this Court's, to resolve such conflicts. Olson v. Westfork Properties, Inc. (1976), 171 Mont. 154, 157, 557 P.2d 821, 823.

This Court reviews the Workers' Compensation court's conclusions of law to determine whether they are correct. CNA Ins. Co. v. Dunn (1995), 273 Mont. 295, 298, 902 P.2d 1014, 1016. In the present case, I would hold that the Workers' Compensation Court reached the correct result, although it improperly relied on § 39-71-407(3), MCA, in doing so. The Workers' Compensation Court analyzed Carrillo as a "traveling employee" under § 39-71-407(3), MCA, and concluded that her injury did not arise out of and in the course of employment. A "traveling employee" is defined as an employee "whose work entails travel away from the employer's premises." See Larson's Workmen's Compensation Law, vol. 1A, § 25.00 at 5-275 (1996). As Carrillo was not required to travel

22

from the Donovan building, I agree with the majority that § 39-71-407(3), MCA, is not applicable to this case.

Section 39-71-407(1), MCA (1991), states in part that "[e]very insurer is liable for the payment of compensation . . . to an employee . . who receives an injury <u>arising out of and in the course of his employment</u>." (Emphasis added.) The injuries must have arisen out of and in the course of her employment in order to impose liability on the insurer.

In Courser v. Darby School District No. 1 (1984), 214 Mont. 13, 692 P.2d 417, we identified four controlling factors to determine whether an injury is work-related: (1) whether the activity was undertaken at the employer's request; (2) whether the employer, either directly or indirectly, compelled the employee's attendance at the activity; (3) whether the employer controlled or participated in the activity; and (4) whether both employer and employee mutually benefited from the activity. <u>Courser,</u> 692 P.2d at 419. Applying the facts of the present case to the above factors leads to the clear conclusion that Carrillo's injuries were not work-related.

Blue Cross Blue Shield (BCBS) did not request that Carrillo make the trip to the Holter Museum to purchase the coffee mug nor did it directly or indirectly compel the errand. Carrillo's supervisors did not control or participate in the quest for the mug and even though the gift and employee party may have boosted employee morale, such a general benefit to the employer is not enough by itself to bring such recreational activity within the

23

course of employment boundaries.  <u>See</u>  <u>Larson's Workmen's Compensation Law</u>, vol. 1A, § 22.33 at 5-170 and -171 (1996). This Court has previously held that a person injured while on a personal errand is not acting within the course and scope of her employment when injured.  Strickland v. State Comp. Mut. Ins. Fund (1995), 273 Mont. 254, 259, 901 P.2d 1391, 1394.

In the present case, the **majority** errs by making a finding of fact that Carrillo was on her break instead of reviewing whether substantial evidence supports the Workers' Compensation Court's finding that she intended to go on break after returning from the Holter Museum gift shop.  Not surprisingly, the majority then places much reliance on Professor Larson's discussion of whether injuries which occur off the employer's premises during rest periods or coffee breaks are compensable.  The majority's entire discussion of the Larson criteria is premised on its own finding that Carrillo was on her break when the injury occurred.  On the contrary, I submit that substantial evidence supports the Workers' Compensation Court's finding that she intended to go on break after returning from the museum gift shop, and therefore, the Larson criteria do not apply.  Nevertheless, even assuming arguendo that the majority is correct and Carrillo was on her break, her injuries are not compensable even under the Larson criteria.

Larson sets forth the following factors:  (1) the duration of the break and whether the interval is a right  fixed by the employment contract; (2) whether it is a paid interval; (3) whether there are restrictions on where the employee can go during the

24

break; and (4) whether the employee's activity during the break period constitutes a substantial personal deviation. Larson, vol. 1, § 15.54, at 4-184 and -185. Larson states that:

> If the employer, in all the circumstances, including duration, shortness of the off-premises distance, and limitations on off-premises activity during the interval can be deemed to have retained authority over the employee, the off-premises injury may be found to be within the course of employment.

Larson, vol. 1, § 15.54, at 4-185.

In the present case, I agree that as a BCBS employee Carrillo was entitled to a break and was paid for the time. However, I do not agree with the majority that BCBS restricted Carrillo on where she could go during the break. The majority opinion correctly notes that Carrillo testified that the breaks were not required and that she was free to leave the building during her break and to go anywhere she wanted. If she chose to undertake a personal errand during her break and was injured, she was outside the scope of her employment. Moreover, I do not agree with the majority's conclusion that her activity during the break did not constitute a substantial personal deviation. On the contrary, Carrillo decided to run a personal errand beyond any authority retained by BCBS. Carrillo was not required by BCBS or her supervisor to purchase the mug and, even though the journey was only one and one-half blocks away from the work place, the purpose was a personal one. The trip to obtain the mug therefore constituted a substantial personal deviation from her employment.

25

The Workers' Compensation Court made a finding that Carrillo was not on her break when the injury occurred and that finding is supported by substantial evidence, including Carrillo's own testimony. Under the traditional <u>Courser</u> criteria and based on our previous holding in <u>Strickland</u>, I would hold that Carrillo was injured when she was on a personal errand outside the scope of her employment with BCBS. Her injuries did not arise out of the course of her employment and therefore are not compensable.

I would affirm the judgment below.

_____
Justice


Justice Karla M. Gray joins in the foregoing dissenting opinion.

_____
Justice

26

Justice Terry N. Trieweiler specially concurring.

I submit the following concurring opinion in response to the dissent.

The dissent seems to agree that Carol Carrillo's disability benefits were denied by the Workers' Compensation Court for the wrong reason. The dissent then goes on to argue that that incorrect decision can be affirmed by taking a portion of her testimony out of context and making a semantic argument that it creates a conflict with other testimony regarding whether she was or was not on break at the time of her injury.

However, a review of the entire record discloses that there is only one point in the entire trial at which any witness is asked directly whether Carol Carrillo was or was not on break at the time she was injured. That point involved the question and answer cited in the majority opinion and relied on for its result.

Nowhere in the entire record did anyone testify that Carol Carrillo was not on break at the time of her injury.

On the other hand, in support of her unequivocal testimony that she was on break, the following undisputed facts were established by her testimony and the testimony of others:

1. Afternoon breaks were allowed during the period of time from 1:30 to 3:00 p.m.

2. The length of time for a break was normally from fifteen to twenty minutes.

3. During breaks employees were encouraged to leave their work stations and even leave the building.

27

4. Seventy-five to eighty percent of Blue Cross's employees left the building during their break.

5. Carol Carrillo normally walked during her break and had she not been on her way to the Holter Museum to pick up a mug for her supervisor's party she would, in all likelihood, still have been walking at the exact time and place where she was injured. She walked ninety percent of the time during her afternoon break.

6. Carol Carrillo's accident occurred at 2:15 p.m. within the normal parameters of her afternoon break.

7. Her break was something that was encouraged and provided as a right of employment in the employee handbook, and during her break she was paid.

8. Although she had to let other employees know where she was going in case her employer needed to recall her, she was free to go where she chose on break and it was not uncommon for employees to go to the walking mall, the Sweetgrass Bakery, Big Al's, the Common Market, the Federal Building, the City-County Building, or to other local business establishments during their break.

Some confusion has been created and it is, at best, minimal confusion, due to the phraseology of questions or answers in which she stated that after returning from the Museum she intended to pick up a fellow employee and go to the Fuller Building to use their vending machines while on break. At one place in the transcript she states that she intended to go to the Fuller Building while "on break." At another place she either states or

28

was told that they would go to the Fuller Building for break. However, there is absolutely nowhere in the transcript where she or anyone else states that she was not already on break at the time that she was going to the Holter Museum. Furthermore, there is nothing inconsistent with starting her break by picking up a gift at the Holter Museum and continuing her break after picking up her co-employee and going to the Fuller Building to pick up refreshments. The record clearly establishes that all of these matters could have been accomplished well within the time allowed for afternoon breaks.

More importantly, neither is there any finding entered by the Workers' Compensation Court to the effect that Carol was not on break **at** the **time** of her injury. The finding made by the court and relied on by the dissent is that after picking up her friend she intended to go to the Fuller Building for break. However, once again, that is not inconsistent with the fact that she was already on break prior to picking up her friend. Had she not been on break she could not have left the building in the first place.

Totally inconsistent with the dissent are the following findings made by the Workers' Compensation Court:

1. Blue Cross Blue Shield provided **its** employees with a fifteen minute break in the morning and another fifteen minute break in the afternoon. (Finding No. 4)

2. Employees at the Donovan Building often walked to the Fuller Building or other nearby locations (Coney Island, the Gold Bar) to take their breaks. (Finding No. 5)

29

3. A substantial number of employees walked during their breaks. (Finding No. 6)

4. On their breaks, employees would sometimes buy going-away gifts from nearby merchants. (Finding No. 7)

5. Claimant and her co-employees planned a going-away party for claimant's supervisor and decided to buy her a replacement coffee mug for the one she had broken. (Finding No. 9)

6. At approximately 2:15 p.m. on March 2, 1993, claimant left the Donovan Building to go to the Holter Museum gift shop, which is approximately a block and a half away from the Donovan Building, to buy Lamping a replacement mug. (Finding No. 10)

I submit that there is no other conclusion that can be drawn from these findings in combination with the undisputed testimony other than that Carrillo was on break at the time of her injury.

_____
us      ce

30